DALTON, Plaintiff-Respondent, v. MEISTER and others, Defendants: AMERICAN CITY BANK & TRUST COMPANY, national association, Appellant.

*No. 593 (1974). Submitted January 7, 1976.—
Decided March 2, 1976.*
(Also reported in 239 N. W. 2d 9.)

---

For the appellant the cause was submitted on the briefs of *Lichtsinn, Dede, Haensel & von Bereghy, S. C.* of Milwaukee, and a supplemental brief by *Gibbs, Roper, Loots & Williams* of Milwaukee.

For the respondent the cause was submitted on the brief of *Aberg, Bell, Blake & Metzner, S. C.* of Madison.

WILKIE, C. J.   On this appeal we are concerned only[1] with the demurrer of the defendant and sole appellant, the American City Bank & Trust Company, in an action commenced by LeRoy Dalton, the plaintiff-respondent, against Howard Meister, defendant, and a number of other named defendants, to wit: Gae Meister; Morris M. Meister, Executor of the Estate of Edith Meister; Ida Sack; Continental Bank & Trust Company; Biltmore Building, Inc.; Norman C. Skogstad; Marilyn Skogstad;

---

[1] Although the bank purports to appeal from both the overruling of the demurrer and the denial of the motion to make more definite and certain, it is well established that no appeal is allowed from the denial of a motion to make more definite and certain because it is not a final judgment, and can be reviewed on appeal from such a subsequent judgment. *Medved v. Baird* (1973), 58 Wis. 2d 563, 566, 207 N. W. 2d 70.

Seven-Up Milwaukee, Inc.; Universal Telephone, Inc.; and Brief, Inc.

As pertinent here the complaint alleges: On or about December 29, 1969, plaintiff Dalton secured a judgment in the amount of $151,749.98 against defendant Howard J. Meister as a result of a defamation suit in the circuit court for Milwaukee county.[2] Except for some $200, this judgment remains unpaid.

In anticipation of the trial, Meister had engaged in transactions with the defendants American City Bank and the Continental Bank (of which he was past president) such that he became indebted to American City Bank in the amount of about $2,500,000. The alleged purpose of these transactions, in which American and Continental allegedly conspired with Meister, was to "liquidate and secrete" from Dalton assets upon which Dalton could have realized subsequent to judgment.

At the same time, Meister, in conspiracy with a bank officer, fraudulently induced his seventy-nine-year-old mother, Edith Meister, who was unable to read English, to execute notes in the principal amount of $1,100,000 to American City Bank. This effectively rendered her estate insolvent, depriving Dalton of access to the one-third interest in Edith's estate bequeathed to Howard Meister under the terms of his mother's will. This transaction also allegedly permitted Howard Meister to partake of and dispose of Edith's assets, and permitted American City Bank to "avoid compliance with the banking laws and regulations."[3] All of the defendants allegedly conspired and participated in this arrangement.

---

[2] The judgment was affirmed on appeal to this court, *Dalton v. Meister* (1971), 52 Wis. 2d 173, 188 N. W. 2d 494, certiorari denied, 405 U. S. 934, 92 Sup. Ct. 947, 30 L. Ed. 2d 810.

[3] Although it is not specifically alleged, this probably refers to the use of the notes fraudulently procured from Edith Meister as collateral for part of the $2,500,000 loan to Meister, who seems

Also prior to the rendering of judgment against him, but in anticipation thereof, Howard Meister purchased real estate in Honolulu, placing the title in the names of Norman and Marilyn Skogstad (neither of whom allegedly furnished any consideration) for the purpose of defrauding Dalton.

In 1971, during the pendency of the appeal in this court, all of the named defendants and Edith Meister entered into an "agreement."[4] This agreement operated to settle the indebtedness of Howard Meister to certain of the defendants, including American City Bank, and to transfer his entire estate and the Honolulu property, rendering him insolvent. This was done by the defendants without the knowledge of Dalton, for the purpose of hindering and defrauding him in the collection of his judgment. There were special relationships between the defendants, as of the time of the relevant transactions, as follows:

Howard J. Meister was past president of Continental Bank, secretary of Biltmore Building, Inc., an undenominated "officer" in Brief, Inc., and a one-third owner of Seven-Up Milwaukee, Inc. Gae Meister is his wife.

Morris M. Meister and Ida Sack are brother and sister of Howard Meister. Morris is president of Seven-Up Milwaukee, Inc., president and treasurer of Brief, Inc., treasurer of Biltmore Building, Inc., and is executor of the estate of Edith Meister. Ida Sack is vice-president of Biltmore Building and secretary of Brief, Inc. The capital stock of Brief, Inc., is equally divided among Howard and Morris Meister, and Ida Sack.

---

to have, in effect realized his (and the other beneficiaries') expectancy in his mother's estate. There is no indication Edith Meister received any consideration for the notes.

[4] This "agreement" is not incorporated into the amended complaint, although it was incorporated into the original complaint.

Edith Meister was president of Biltmore Building, Inc.

Raymond Dittmore is president of both Continental Bank and Universal Telephone, Inc.[5]

Norman C. Skogstad (spouse of Marilyn Skogstad) was Howard Meister's attorney during the trial leading to the judgment underlying this action.

The complaint is divided into three alternative causes of action: The *first* alleges fraud in the American City loan to Meister and the subsequent "agreement" disposing of Howard Meister's estate, and demands that the "agreement" be set aside to the extent necessary to permit Dalton to collect his judgment, or that Dalton be permitted to execute against the property conveyed by the "agreement" or the proceeds thereof; the *second* alleges that the "agreement" operated as a voluntary assignment for the benefit of creditors such as is described in ch. 128, Stats., but that it failed to conform to the procedures required by ch. 128, creating a preference in favor of the parties to the "agreement," and demands that the agreement be voided and Meister's property distributed ratably to all of his creditors; the *third* alleges that a "resulting trust" was created in the Honolulu property in favor of Meister's creditors, and that the "agreement" precluded Dalton, as a creditor, from obtaining his share of the trust proceeds, and demands that the "agreement" be voided and the trust proceeds distributed to all creditors.

The trial court overruled the defendant-appellant bank's demurrer to plaintiff's complaint.

Several issues are presented by this attack on the trial court's order:

---

[5] The complaint does not mention it, but the "agreement" reveals that Howard Meister owned 26,747 shares of Universal Telephone, Inc. stock, pledged to American City as security for its loan to him.

1. Does a Wisconsin court have jurisdiction to recognize and enforce a "resulting trust" in land located in Hawaii?

2. If so, is such a proceeding properly joined to the main action for conspiracy to defraud?

3. Is the personal representative of Edith Meister, Morris Meister, a necessary party?

4. Is a proceeding under ch. 128, Stats., properly joined to the action for conspiracy to defraud?

5. Does the complaint state facts sufficient to constitute a cause of action for conspiracy to commit fraudulent conveyances in violation of ch. 242, Stats.?

The answer to issues 1, 2, 4 and 5 is "Yes;" the answer to issue 3 is "No." We therefore affirm.

### *Jurisdiction and Joinder of the Action Involving Land in Hawaii.*

The American City Bank first argues that Wisconsin courts have "no jurisdiction to create a resulting trust in land in Hawaii," since creation of such a trust is within the "sole and exclusive jurisdiction" of that state. While it is true that the law of the state of situs may be applicable to determine the existence of a fraudulent conveyance of or resulting trust in the land,[6] this does not

[6] 15A C. J. S., *Conflict of Laws*, p. 512, sec. 19 (3) b: ". . . As a general rule, whether or not a conveyance of land is to be deemed a fraudulent conveyance is to be determined by the law of the situs of the land, as is further considered in Fraudulent Conveyances sec. 3."

89 C. J. S., *Trusts*, p. 941, sec. 99: "The existence of a resulting trust with respect to land is to be determined by the law of the state wherein the land is located.

"Whether or not a resulting trust has arisen in respect of certain land is to be determined by the laws of the state in which the land is located."

Restatement 2d, *Conflict of Laws*, p. 10, sec. 223: "(1) Whether a conveyance transfers an interest in land and the

mean that courts of any other state are powerless to issue orders, arising from rights claimed in the proceeds of such land, to persons over whom *in personam* jurisdiction exists.

The Restatement provides:

"A state has power to exercise judicial jurisdiction to order a person, who is subject to its judicial jurisdiction, to do, or not to do, an act in the state, although the

nature of the interest transferred are determined by the law that would be applied by the courts of the situs."

Restatement 2d, *Conflict of Laws*, p. 25, sec. 226: "(1) Whether there has been a transfer of an interest in land by operation of law and the nature of the interest transferred are determined by the law that would be applied by the courts of the situs."

In *James v. Powell* (1967), 19 N. Y. 2d 249, 257, 258, 225 N. E. 2d 741, the New York court held that a judgment creditor attempting to execute against Puerto Rican property allegedly fraudulently conveyed by the debtor must operate under the law of Puerto Rico, citing the substance of Restatement 2d, *Conflict of Laws*, sec. 223, and stating:

"To put the matter somewhat differently, the law of New York does not and cannot determine the extent to which property located outside the State is subject to execution by a judgment creditor. Therefore, whether or not the plaintiff was defrauded by the conveyance to the Diagos may not be resolved under our own rules. We do, of course, have an interest in assuring that a New York judgment creditor is not prevented by wrongful acts of his debtor from satisfying the judgment. To the extent that satisfaction must come from execution on the debtor's assets in a foreign jurisdiction, this State may legitimately demand that there be no arbitrary discrimination by that jurisdiction against New York judgment creditors as compared with local judgment creditors. *(See: Watkins v. Conway,* 385 U. S. 188 [87 Sup. Ct. 357, 17 L. Ed. 2d 286].) However, assuming that no such discrimination is practiced by Puerto Rico, then, the availability of a remedy to a judgment creditor who has been prevented from levying execution by a transfer of land located in that jurisdiction constitutes a matter of policy which is properly determinable by the law of Puerto Rico rather than that of New York."

carrying out of the decree may affect a thing in another state."[7]

In *Bailey v. Tully*[8] this court held that the *in personam* decree of a California court ordering that a conveyance be made by one party to the other was *res adjudicata* in a subsequent Wisconsin action; although a foreign court could not render a judgment directly affecting real estate in Wisconsin, it could issue a decree operating upon the persons of the defendants, and enforceable by contempt proceedings. The subject matter of the suit was not the land itself, said the court, but the rights of one party in the land. Even more clearly in the instant case, the subject of this suit is Dalton's rights in the proceeds of the Hawaiian land; he seeks only a judgment against Meister and the Skogstads, and has no interest in the land itself. The *Bailey* holding is equally applicable here and in a reverse sense, Wisconsin courts may issue *in personam* orders which may operate on out-of-state property.[9]

The bank further objects to the inclusion in this action of the Hawaiian land dispute on the ground that this dispute concerns only Dalton, Meister, and the alleged trustees of the land (Skogstads), making joinder improper under sec. 263.04, Stats.,[10] because not all parties to the broader conspiracy suit are concerned with the land. This argument completely overlooks the alleged facts that the Hawaiian land was disposed of in the

[7] Restatement 2d, *Conflict of Laws*, p. 189, sec. 55.

[8] (1943), 242 Wis. 226, 230–232, 7 N. W. 2d 837.

[9] *State ex rel. Walling v. Sullivan* (1944), 245 Wis. 180, 185, 13 N. W. 2d 550.

[10] "263.04 **Uniting causes of action.** The plaintiff may unite in the same complaint several causes of action, whether they be such as were formerly denominated legal or equitable or both. But the causes of action so united must affect all the parties to the action and not require different places of trial, and must be stated separately."

"agreement" for the benefit of Meister's other creditors, and that the requested remedy of voiding the "agreement" and applying the land proceeds to the benefit of all creditors would apparently affect the parties to that "agreement," who are the defendants in this case. The alleged fact that the Hawaiian land was integral to the agreement also precludes the bank from arguing that Dalton has improperly joined two different causes of action, since there is only " ' "one primary right sought to be enforced or one subject of controversy presented for adjudication" ' "[11]—the disposition of Meister's property (whether held by him or in trust for his creditors) attempted by the "agreement."

Even if the Hawaiian land was not included in the "agreement," sec. 263.04, Stats., would not bar joinder, for we have held that in an equitable action it is not necessary that all forms of relief affect all of the defendants,[12] and that the statute dealing specifically with joinder of defendants, sec. 260.11,[13] will take precedence

---

[11] *Rogers v. Oconomowoc* (1962), 16 Wis. 2d 621, 627, 115 N. W. 2d 635.

[12] *Usow v. Usow* (1933), 213 Wis. 395, 401, 251 N. W. 458, quoted recently in *Antigo Superior Nursing Home, Inc. v. First Federal Savings & Loan Asso.* (1971), 51 Wis. 2d 196, 204, 186 N. W. 2d 265: ". . . where an equitable cause of action is asserted many different kinds of relief may be demanded even though the different kinds of relief do not affect all of the parties to the action, so long as the relief is incidental, auxiliary, or germane to the principal controversy, promotes the administration of justice and a complete determination of the controversy."

[13] "260.11 **Who as defendants.** (1) Any person may be made a defendant who has or claims an interest in the controversy adverse to the plaintiff, or who is a necessary party to a complete determination or settlement of the questions involved therein. A plaintiff may join as defendants persons against whom the right to relief is alleged to exist in the alternative, although recovery against one may be inconsistent with recovery against the other . . . ."

when there is a conflict with sec. 263.04.[14] Under sec. 260.11, all defendants in this case are properly included in their capacity as creditors (or possible creditors) of Howard Meister having an interest in the proceeds of the Hawaiian land.[15]

### Joinder of Edith Meister's Interests.

The defendant-appellant bank demurs on the basis that the personal representative of the Edith Meister estate is not joined although a necessary party.

It is clear that the complaint alleges that Howard Meister acquired effective control over his mother's property for the purpose of defrauding *Dalton*, but the pleadings gratuitously allege further that Howard defrauded *Edith* as well. Dalton claims that the fraud on Edith Meister is one of several "indicia or badges" of the defendant's fraud on him. For this purpose, he need not establish that Edith's will was or could have been probated, and need not join the personal representative, since the only relevant fact would be Howard's intent to defraud creditors by draining his mother's estate.

### Joinder of Ch. 128 Proceeding.

The question here is whether Dalton's pursuit of his rights under ch. 128, Stats., is properly joined to his first cause of action for conspiracy to defraud. The bank argues that (1) a proceeding under ch. 128 is a "special proceeding" rather than an "action," within the meaning

[14] *Rogers v. Oconomowoc, supra,* footnote 11, at page 628: "Also, if the two statutes conflict, sec. 260.11 prevails over the limitation of sec. 263.04 which demands that a cause of action united in a complaint must affect all parties to the action."

[15] *Ewing v. General Motors Corp.* (1975), 70 Wis. 2d 962, 236 N. W. 2d 200.

of sec. 260.03, Stats.,[16] and (2) as a special proceeding it cannot be joined with the action for fraudulent conveyance.

"A voluntary assignment for the benefit of creditors is not an action but a special proceeding."[17] Dalton, by demanding in his complaint that, pursuant to sec. 128.06, Stats., the court compel proceedings in accordance with ch. 128, is asking for the same remedy that would apply in a typical voluntary assignment. This is a "special proceeding." This proceeding can be properly joined with an action.

The bank cites two cases to support the proposition that a "special proceeding" cannot be joined with an "action."[18] *Wisconsin Brick & Block*[19] concerned only whether a separately-instituted ch. 128 proceeding could be *consolidated* with an "action" under sec. 269.05, Stats.,[20] which speaks only of "actions." *Joinder* under sec. 263.04[21] was not considered.

---

[16] "260.03 **Action defined; special proceeding.** An action is an ordinary court proceeding by which a party prosecutes another party for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense. Every other remedy is a special proceeding."

[17] *Wisconsin Brick & Block Corp. v. Vogel* (1972), 54 Wis. 2d 321, 324, 325, 195 N. W. 2d 664, citing *Lamont v. Hibbard, Spencer, Bartlett & Co.* (1894), 88 Wis. 109, 59 N. W. 456.

[18] *Wisconsin Brick & Block Corp. v. Vogel, supra,* footnote 17; *Kontominas v. Popp* (1949), 256 Wis. 169, 40 N. W. 2d 512.

[19] *Supra,* footnote 17.

[20] "269.05 **Consolidation of actions.** When two or more actions are pending in the same court, which might have been joined, the court or a judge, on motion, shall, if no sufficient cause be shown to the contrary, consolidate them into one by order."

[21] "263.04 **Uniting causes of action.** The plaintiff may unite in the same complaint several causes of action, whether they be such as were formerly denominated legal or equitable or both. But the causes of action so united must affect all the parties to the action and not require different places of trial, and must be stated separately."

In *Wisconsin Brick & Block* this court observed:

". . . Although the parties agreed to consolidate the foreclosure actions with the ch. 128, Stats., proceeding and the order thereon stated the consolidation was for the purpose of determining all the rights of the parties, it is questionable whether the consolidation was one which could be effected under sec. 269.05. A voluntary assignment for the benefit of creditors is not an action but a special proceeding [,] *Lamont v. Hibbard, Spencer, Bartlett & Co.* (1894), 88 Wis. 109, 59 N. W. 456, and strictly does not come within the language of the consolidation section."[22]

This is dicta, which is not an accurate statement of the law. Rather, a liberal construction should be given to the word "actions" in sec. 269.05, and the phrase "cause of action" in sec. 263.04, to include "special proceedings," permitting consolidation or joinder of "actions" and "special proceedings." Accordingly, we are convinced that a "special proceeding" may be joined with an "action."

In *Kontominas v. Popp*[23] joinder was denied under sec. 263.04, Stats., because the separate causes of action affected different parties and required different places of trial, but not because of any incompatibility between "special proceedings" and "actions."

Therefore, we conclude that neither of these cases stands for the proposition that a special proceeding cannot be joined with an action.[24]

---

[22] *Wisconsin Brick & Block Corp. v. Vogel, supra,* footnote 17, at pages 324, 325.

[23] *Supra,* footnote 18.

[24] Although the new Wisconsin Rules of Civil Procedure (67 Wis. 2d 587) are not legally applicable to this case since they are effective January 1, 1976, the commentary indicates no previous understanding that a "special proceeding" and "action" could not be joined, and the rules themselves give no indication that such joinder would be improper. Any *per se* distinction between "actions" and "special proceedings" is obliterated:

"801.01 **Kinds of proceedings; scope of Title XLII–A.** (1) KINDS. Proceedings in the courts are divided into actions and special

Under the law applicable to the present case, joinder of several forms of relief arising from several legal theories is permitted, if but a single "primary right" or "subject of controversy" is presented, even if the forms of relief do not affect all parties equally.[25]

We have said:

"In general, the statutes [sec. 263.04] provide that the joining of several causes of action in the same complaint is permitted when the following appears: The causes (1) must affect all the parties to the action; (2) must not require different places of trial; (3) must be separately stated. Where the actions are equitable in nature, courts will now take into consideration the entire subject matter and retain such jurisdiction until all matters involved in the litigation and connected with the subject matter are finally disposed of. . . .

". . .

"Looking to the substance of the complaint rather than to the form it might be determined that the complaint sets up but one cause of action. The plaintiff asserts but one primary right or purpose, *viz.*, to seek an ac-

proceedings. 'Action,' as used in this title, includes 'special proceeding' unless a specific provision of procedure in special proceedings exists."

Moreover, the rule concerning claims joinder does not speak of "actions" or "special proceedings," but only of "claims":

"803.02 **Joinder of claims and remedies.** (1) A party asserting a claim to relief as an original claim, counterclaim, cross claim, or third-party claim, may join, either as independent or as alternate claims, as many claims, legal or equitable, as he has against an opposing party."

The section, says the Judicial Council Committee's Note, "creates an unlimited right of claim joinder." 67 Wis. 2d 642.

[25] *Usow v. Usow* (1933), 213 Wis. 395, 401, 251 N. W. 458: "It seems to be fairly established that where an equitable cause of action is asserted many different kinds of relief may be demanded even though the different kinds of relief do not affect all of the parties to the action, so long as the relief is incidental, auxiliary, or germane to the principal controversy, promotes the administration of justice and a complete determination of the controversy."

counting from his business associates. The other relief sought is incidental, auxiliary, and germane to the principal controversy. Under the liberal rules of pleading now in effect the administration of justice will be best promoted by trying in one action the issues presented in the complaint."[26]

In the present case, Dalton has asserted a single "primary right"—his claim against Meister's former property. Although he seeks relief under the alternative theories that the defendants now hold Meister's property as the result of (1) fraudulent conveyance or (2) voluntary assignment, and seeks alternative remedies depending on the theory accepted, the remedies will all involve all of the defendants insofar as they are all parties to the "agreement" Dalton wishes to void. The fact is not critical that attachment of and execution against Meister's property under the fraudulent conveyance theory may affect some of the defendants (specifically the bank) differently than would a receivership created under ch. 128.

### Sufficiency of Facts Alleged.

Finally, the bank attacks Dalton's first and principal cause of action on several grounds. This cause of action is an alleged conspiracy to effect fraudulent conveyances in violation of ch. 242, Stats. The bank claims: (1) No action for conspiracy to defraud by fraudulent conveyance is possible; (2) Dalton's remedy under ch. 242 is directly against the property fraudulently conveyed, and not against the bank; and (3) the complaint fails to describe the allegedly fraudulent conveyances with sufficient specificity. None of these contentions has merit.

[26] *Whaling v. Stone Construction Co.* (1958), 5 Wis. 2d 113, 118–120, 92 N. W. 2d 278. *See also: Antigo Superior Nursing Home, Inc. v. First Federal Savings & Loan Asso.* (1971), 51 Wis. 2d 196, 202, 186 N. W. 2d 265.

*Conspiracy to Fraudulently Convey.* Dalton's first cause of action is in tort, for civil conspiracy to commit fraudulent conveyances. This court has consistently defined a conspiracy as follows:

". . . The *Holsinger Case* defines a civil conspiracy as follows (p. 1225): 'Conspiracy "is a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful." ' This is substantially the same definition as set forth in *Martens v. Reilly, supra,* at page 473. As pointed out in the latter case the word 'unlawful' employed in such definition is not confined to criminal acts but includes all wilful, actionable violations of civil rights."[27]

Here there is no question that fraudulent conveyances of Meister's property, if proved, would be unlawful. There can also be no dispute that the alleged "agreement" between the defendants is a "combination of two or more persons by some concerted action." This court has previously recognized conspiracies to defraud creditors.[28]

The bank does not seem to be contesting the established principle that the liability of conspirators is joint and several.[29] The fact that the bank itself may not have benefited from the fraudulent conveyances alleged to have occurred pursuant to the "agreement," does not exonerate it from potential liability as a conspirator.[30]

The bank bases its claim that no actionable conspiracy exists upon a misinterpreted section of *American Jurisprudence,* and two cases decided before the enactment of the Uniform Fraudulent Conveyance Act, ch. 242,

[27] *Mendelson v. Blatz Brewing Co.* (1960), 9 Wis. 2d 487, 490, 101 N. W. 2d 805.

[28] *Michels v. Michels* (1942), 240 Wis. 539, 3 N. W. 2d 359, 4 N. W. 2d 78.

[29] *Drexler v. Zohlen* (1934), 216 Wis. 483, 487, 257 N. W. 675; *Michels v. Michels, supra,* footnote 28, at page 545.

[30] 15A C. J. S., *Conspiracy,* p. 658, sec. 18; *see also: Drexler v. Zohlen, supra,* footnote 29.

Stats. As Dalton points out, the relevant quote from *American Jurisprudence* reads as follows:

"Sec. 51. To DEFRAUD CREDITORS AND OTHERS.

"It seems that a mere general creditor, without a lien, has no interest in the debtor's property, and is not legally injured by a conspiracy with the debtor to aid him in disposing of his property in order to evade payment of his general obligations, and that an action for damages cannot be based on such conspiracy. In support of this proposition some cases invoke the principle that what is not unlawful if done by an individual cannot be the object of an actionable conspiracy.

"...

"An action based on a conspiracy to defraud may be maintained to recover for any damage suffered through acts of the conspirators. This would include a loss resulting from a conspiracy to misrepresent the financial condition of a corporation, and a loss suffered through a conspiracy to defraud by concealment." (Emphasis supplied.)[31]

The bank has ignored the underlined language in the first paragraph; in the present case the alleged fraudulent conveyances *would have been unlawful* if perpetrated by an individual.

It is unnecessary to examine at length the rather complicated decisions of *Schwenn v. Schwenn*[32] and *Field v. Siegel*,[33] both cited by the bank as supporting its position on this point. To the extent that these cases may hold that no actionable conspiracy exists as a result of conveyances of a debtor's property because creditors have suffered no legal wrong, their reasoning was demolished by the subsequent passage of the Uniform Fraudulent Conveyance Act, which makes conveyances of a debtor's property under conditions such as those alleged in the

[31] 16 Am. Jur. 2d, *Conspiracy*, p. 153, sec. 51.
[32] (1918), 166 Wis. 420, 166 N. W. 171.
[33] (1898), 99 Wis. 605, 75 N. W. 397.

complaint a definite legal wrong. Such tortious convey-ances may properly be the subject of a civil conspiracy.

*Remedies.* The bank argues that under the Uniform Fraudulent Conveyance Act, Dalton's remedies are limit-ed to those set forth in sec. 242.09, Stats.,[34] and that since there is no specific allegation that the bank received any of the fraudulently conveyed property (in other words, gave less than "fair consideration" under secs. 242.03 and 242.04)[35] Dalton has no remedy against the bank. Without considering whether the complaint does, in fact, allege any fraudulent conveyances to the bank, it is sufficient to note that Dalton has stated a cause of action against the bank for *conspiracy,* which provides

[34] "242.09 **Remedies of creditors.** (1) Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser, (a) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or (b) Disregard the conveyance and attach or levy execu-tion upon the property conveyed.

"(2) A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obliga-tion, may retain the property or obligation as security for re-payment."

[35] "242.03 **Fair consideration defined.** Fair consideration is given for property, or obligation, (a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or (b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not dis-proportionately small as compared with the value of the property, or obligation obtained."

"242.04 **Contract producing insolvency, fraudulent.** Every con-veyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

him with damage remedies that are independent of those provided under ch. 242.

*Specificity of the Allegations.* The bank also asserts that the complaint is simply too vague in alleging the fraudulent conveyances which underlie the conspiracy action. The trial court felt otherwise, stating:

"It is inconceivable to me that any one of the defendants in this case would find it too difficult to understand what he is being charged with. I cannot conceive of any one of the defendants who would be unable to plead in this case to what is alleged to have taken place. If in fact there are items of information that are necessary for the defendants to have in order to plead or in order to prepare, you are all good lawyers, you have all been through the mill and you all know the discovery procedures that you have at your disposal: interrogatories, make demand to admit or deny certain facts, all of the avenues that are open to you to ascertain what the complete facts are."

The complaint sets forth in detail a series of transactions culminating in a specific, lengthy, written "agreement," conveying Meister's property, which, although not specifically appended to the complaint, is certainly well known to the bank.

*By the Court.*—Order affirmed.